ASOCIACIÓN AZUCARERA COOPERATIVA LAFAYETTE, Plaintiff and Appellee, *v.* AGUSTÍN ARAMBURU, Defendant and Appellant.

No. R-69-78.     Decided October 16, 1970.

*Antonio Figueroa Rivera* for appellant. *Luis Domínguez Rovira* for appellee.

MR. JUSTICE MARTÍNEZ MUÑOZ delivered the opinion of the Court.

By means of public deed number 171 executed before notary Luis Domínguez Rovira on July 19, 1960, the Asocia-

ción Azucarera Cooperativa Lafayette granted in sublease to Agustín Aramburu a parcel of land composed of 225.43 cuerdas situated in the Ward Algarrobos, Guayama, for an annual rent of $8,308.90, payable in advanced quarters at the rate of $2,077.22 each quarter on the first day of July, October, January, and April of each year, the parties agreeing that Aramburu would pay, in addition, the property taxes of the property, as well as the irrigation tax. A term of five years was affixed to the contract to be counted as of July 1, 1960, antedate of its effects and to fall due on July 1, 1965. Aramburu expressly agreed that the parcel of land taken in sublease would be preferably dedicated to the cultivation of sugarcane and that all the sugarcane cultivated, harvested, and produced would be exclusively ground at the sugar factory called "Central Lafayette" in Arroyo, property of the Asociación, during all and each of the grinding seasons covered by the term of the duration of the contract. Aramburu also bound himself to open a special savings account at the Banco de Ponce, Arroyo Branch, with a deposit of $8,308.90 which sum and savings account would become pledged in favor of the Asociación to guarantee the payment of the rentals and the faithful performance of all the clauses and conditions of the contract delivering to the latter the corresponding bankbook; the violation of this condition would give rise to its rescission.

Said deed was executed in compliance with the agreement of the parties in a private document signed by them on April 19, 1960.

The fifth clause of deed number 171 reads as follows:

"Fifth: It is clearly agreed that notwithstanding the date set for the expiration of the sublease agreed herein, Agustín Aramburu, by virtue of these presents pledges and binds himself to deliver to the sublessor, 'La Asociación', the lands dedicated to sugarcane, which said Aramburu cultivates in the measure in which he performs the cutting and harvesting of the canes in the

last year of the effectiveness of the present contract, it being clear that all of the improvements which are introduced, made or verified, whatever its nature, including the sprouts and any other plantations shall remain in benefit of the property or parcel object of the present contract, without being entitled to any indemnization for such improvements which remain in said parcel at the expiration of the present contract. Said Agustín Aramburu shall preserve and deliver, in the same state in which they are now, the fences existing in the parcel which is being subleased to him, abstaining from moving them from their respective places, especially, the fences established on the boundaries of the principal property."

On February 14, 1965, already in the third quarter of the last year of the contract, the Asociación sent Aramburu a letter the text of which reads as follows:

"We shall be grateful if you order the man in charge of your property in Arroyo to begin delivering, as the cutting of the sugarcane is being performed, to our employee Enrique Pagán."

On February 22, 1965, Aramburu delivered to the Asociación one hundred ten cuerdas and the remnant, that is, 115.43 cuerdas, on March 25, 1965. Since those two deliveries the Asociación, according to a finding of fact of the trial court, assumed exclusive and full possession and control of the lands and immediately began its conditioning, as well as the cultivation of the roots of cane using therefor the service of irrigation, Aramburu becoming completely separated from the possession, control and use thereof.

It was on account of these deliveries that the controversy object of adjudication by the trial court arose between the Asociación and Aramburu. On the one hand the Asociación understood that Aramburu was bound to pay the rentals over the complete sublease property corresponding to the last quarters—January to March and from April to June 30, 1965 —the property tax and the irrigation tax of all the last year's pay 1964–1965.

On the other hand Aramburu maintained the view that the expiration date of the contract—five years as of July 1, 1960 and to become due on the same day and month of the year 1965—stipulated in the third clause of deed number 171 —had been modified by the fifth clause providing for the advanced delivery of the property, the date of the delivery to the Asociación of a portion of 110 cuerdas on February 22, 1965, and the remnant of 115 cuerdas on March 25, 1965, being established as the expiration date of the contract. His position, therefore, was that he was bound to pay the rentals and the property taxes for the whole property until February 22, 1965, date when he delivered the portion of 110 cuerdas. From there on he was only bound to pay the corresponding part of those two concepts on the 115 cuerdas remnant until March 25, 1965, when he delivered it to the Asociación. As to the irrigation tax Aramburu maintained that his obligation to pay it covered only the time and in the measure in which he used it and not until July 1, 1965, as the Asociación alleged.

Said controversy was raised before the trial court within an action filed by the Banco de Ponce on August 9, 1965, under Rule 19 of the Rules of Civil Procedure, to compel the Asociación and Aramburu to elucidate among themselves their respective rights, previously claimed, to the balance of the savings account opened by Aramburu in said bank as guarantee of his obligations under the sublease with the Asociación whose balance, including interest, amounted to $9,383.61, sum which was deposited in the court by a check issued in favor of the Clerk. Against those funds, at Aramburu's request, the court ordered the delivery to the Asociación of $2,980.54 as payment of certain items owed over which there was no controversy, a balance of $6,103.07 remaining in the court to be litigated by the parties.

The trial court decided the issue favorably for Aramburu in relation to the irrigation tax. The court determined that

as Aramburu had reimbursed the sum of $2,959.26 to the Asociación covering the total corresponding to the last year payment and according to the contract he was only bound to reimburse the former on the basis of acres-feet of water which he used or consumed for the irrigation of the property, Aramburu was entitled to a credit which was calculated at $863.10 against the Asociación for the period subsequent to the deliveries of the two parcels of land. The fixing of said credit has not been challenged in this appeal.

The instant appeal attacks the trial court's determination as to Aramburu's obligation to pay the total of the rentals of the last two quarters,[1] and the waiver of his alleged right to be credited or reimbursed the proportional part of the property tax which Aramburu had previously paid in its entirety for the period subsequent to the delivery of the property. The controversy was decided by the trial court in the following manner:

"As defendant owes plaintiff $4,064.40 for the rentals corresponding to the last two quarters of the sublease and nothing for the property tax, and plaintiff is bound to credit defendant $863.10 which he unduly paid for irrigation tax, defendant owes plaintiff the balance of $3,201.30. It is proper then, that the sum of $3,201.30 which defendant owes plaintiff plus the costs of this proceeding, be deducted from the amount of $6,103.07 which the former has deposited in the Court for such purpose and that the remnant be returned to defendant, once the judgment in this case is final."

Aramburu maintains that the trial court committed error in ordering him to pay the Asociación the rentals and the property tax for the whole last year, notwithstanding his having delivered the property before the term of five years stipulated in the contract had expired. He argues that in delivering the property in advance there and then the object

---

[1] The Superior Court concluded that said rental was at the rate of $2,032.20 per quarter which was what the "Asociación" charged Aramburu or $4,064.40 although said rental had been fixed in the deed at $2,077.22.

and cause in the contract ceased to exist and his contractual relations with the Asociación ceased definitively; that to maintain the contrary would be tantamount to imposing on him a penalty without its having been agreed, granting the Asociación an unjust enrichment at his expense.

Aramburu filed a petition for review and we consented thereto. A careful study of the clauses, conditions and stipulations of the parties in the sublease has convinced us that the same are free from ambiguity and that we can hardly avoid the conclusion that Aramburu, as the trial court decided, is bound to pay the Asociación the rentals and property taxes until June 30, 1965, date agreed upon by the parties in clear and precise terms for the expiration of the sublease contract.

The third clause of deed number 171 fixing the term of the sublease is clear and should not be subject to construction since it states thus:

"Five (5) years is the term or duration of the present sublease, to be counted as of the first day (1st) of July nineteen sixty (1960) antedate of the effects of these presents and to become due therefore on the same day and month of the year nineteen sixty-five (1965) without further extension or renewal."

The clause fixing the rental, which is the second one, states that it is performed ". . . in consideration of the payment of the rental of eight thousand three hundred eight dollars and ninety cents ($8,308.90) yearly, said rental payable in advanced quarters . . . ."

The one in relation to the obligation of the payment of the property taxes provides that Aramburu ". . . and the other sublessees of the other lots or segregated parcels of the principal property, shall also pay from their exclusive accounts, the total of the property taxes imposed or to be imposed in the future, during the existence of the instant contract or sublease. . . ."

The terms of the effectiveness of the contract, the obliga-

tion about the payment of the rentals and the property taxes not only do not offer any doubt as to which was the intention of the parties, but the latter after being examined in the light of the acts of the parties, previous, coetaneous and subsequent to the execution of deed number 171, and of other attending circumstances, agrees with the literal sense of the former.

It is an admitted fact, adopted by the trial court in its findings, that Aramburu came into advanced material possession of the lands on June 20, 1960, that is to say, prior to the date of effectiveness of the contract of sublease. That was by virtue of the terms of the private contract signed by the parties on April 19, 1960, which provided in its fifth clause that Aramburu would ". . . take charge of the property and continue receiving from Mariani as he performs the cutting of the sugarcane in the same."

In the same private contract, under the title "Term of the sublease" it was stipulated:

"The term of this sublease is for five (5) years, as of July 1, 1960, but Aramburu will be bound to deliver as he cuts the cane during the last year of the contract."

In other words, since prior to July 1, 1960, the parties not only had agreed to the advanced delivery of the property to Aramburu, but as a question of fact, the latter took charge of the same as he was cutting the cane of the last preceding grinding season, planted and cultivated by the prior occupant, Mr. Mariani. The parties contemplated the possession of the property by Aramburu on a prior date to the effectiveness of the contract. In that same contract Aramburu bound himself to deliver it during the last year of the effectiveness of the contract "as he cuts the cane." Nothing was said in the private contract as to the fact that Aramburu would pay a rental for the period corresponding to his possession before the effectiveness of the contract. Nor was it contemplated that Aramburu would be entitled to a reduction in the rental for the advance delivery of the property.

The payment of the property taxes was also discussed in the private contract. It was said therein that "The property taxes shall be paid by Aramburu . . . corresponding to the parcels subleased by Mr. Aramburu." No reduction for said item was contemplated on account of the advance delivery of the property.

Deed number 171 about sublease was executed on July 19, 1960. On that date three months had elapsed since Aramburu signed the private contract with the Asociación. The fact that the deed did not provide a reduction, credit or reimbursement of the rentals nor of the property taxes could not be a surprise for him. The fifth clause of deed number 171 could not offer any doubt whatsoever in Aramburu's mind that the same contained the view of the parties as it appears expressed and agreed to in the sixth clause of the private contract.

If the manner in which the parties discussed the payment of the irrigation tax in the sublease deed is compared, it will be noted that as to this part, different from the payment of the rentals and property taxes, the parties used a formula based not on the effectiveness of the contract nor on annuities, but "on the basis of the acres-feet of water which he *uses* or *consumes* in said parcel. . . ." (Italics ours.)

The circumstances which appear from the record, occurring subsequently to the execution of deed number 171, do not show any change or doubt as to which was the intention of the parties. Rather they affirm the terms of deed 171. One of the conditions of said deed imposed on Aramburu the obligation of securing the payment of the rentals by a deposit of $8,308.90 in a special savings account in a bank pledging the account in favor of the Asociación. The nonperformance by Aramburu of said condition gave ground to the Asociación to inform him that they would consider the contract as rescinded. On March 22, 1962, Aramburu and the Asociación executed deed number 8 about Renewal of Lease before Notary Guillermo Cintrón Ayuso. In that deed the Asociación

agreed not to rescind the contract but to continue it subject to certain conditions, among others, the condition that Aramburu would make said deposit within a term of five days. The parties left in effect each and every one of the conditions contained in the sublease contract. Almost two years had elapsed since the date of the execution of deed number 171. Two years during which no doubt was harbored, or at least expressed by Aramburu.

Section 1433 of the Civil Code (31 L.P.R.A. § 4012) indicates that the determination of the time and the certainty of the price are the essential characteristics of the lease. In this case the contract has a fixed term. It also has a fixed price. Aramburu asks us to fix a shorter term to the contract and a lower price than the one which was agreed upon by the parties. That is justified, according to him, under the theory that when he delivered the property in advance the object and cause of the contract ceased to exist; the obligation of the proportional payment of the rentals and the property taxes ceasing since then.

We cannot agree thereto. The contract which Aramburu signed did not have as an object the 225 cuerdas of land considered by themselves. The object of the contract relied in the use of the harvest of the sugarcane which he was to plant and cultivate. It was thus considered by the parties in the contract upon agreeing in the seventh and eighth clauses of deed number 171 in stating in one and the other that "[all] the canes . . . shall be and will be totally and exclusively ground . . . in the factory . . . during all and each of the grinding seasons covered by the term of duration of this contract . . ." and that "[The sublessee] binds himself . . . to plant . . . and cut . . . sugarcane plantations to the maximum of the productive capacity of said property, during each and every one of the years covered by this contract . . . ." Moreover. In the aforementioned deed about renewal of the lease Aramburu agreed:

". . . to cut his cane when Central Lafayette begins to grind so that the cutting is performed at the same rhythm as the grinding so that both begin and end at the same time." (Clause 6, Deed about Renewal of Lease, Tr. of R., p. 96.)

A contract of five years which allowed Aramburu to plant and harvest during the same number of grinding seasons or agricultural terms is involved. That is what Aramburu contemplated, seeking to obtain the maximum of the productive capacity of the property. X Manresa, *Comentarios al Código Civil Español* 294 (6th ed. 1969), commenting on the provisions of the Code about the reduction of rental for loss of fruits due to extraordinary fortuitous cases stated:[2]

"Pacifizi Mazzoni, considering an analogous provision of the Italian Code of 1865, states that the right to receive rent is correlative with the obligation of making the thing enjoyable and that, therefore, the reduction of the rent should correspond to the reduction of the enjoyment. It is to be remembered, said author adds, that the object of the lease contract is not the rural property considered by itself, but as a producer; the lessor should deliver the thing to the lessee not merely for him to have it, but *ut frui possit;* so, that the expected crops are considered in the lease of a rural property as an integral part of the thing leased, and each crop before being perceived, makes up one whole with the property, whether the contract, as well as the reality of the things are considered."

The intention of the fifth clause of the deed is clear. Its obvious purpose was to avoid the inconveniences on account of the harvest of the last annuity, Aramburu binding himself to deliver in the measure in which he was cutting, being forewarned that once July 1, 1965 arrived, all the improvements, including the sprouts and other plantations would remain for the benefit of the property without being entitled to indemnity. When a term of sublease was agreed upon it was the will of the parties not to have to resort to the suppletory

---

[2] Sections 1575 and 1576 of the Spanish Civil Code equivalent to §§ 1465 and 1466 of ours. (31 L.P.R.A. §§ 4081–4082.)

solution which § 1467 of the Civil Code offers (31 L.P.R.A. § 4083):

"The lease of a rural estate, when its duration is not fixed, shall be understood as executed for the full time required for the gathering of the fruits which the whole estate leased might produce in one year, or all it could produce at one time, even though two or more years may be necessary to obtain them.

"That of arable lands, divided into two or more crops, shall be considered as executed for as many years as there are crops."

The fifth clause of the deed contemplated also to avoid the possibility of controversy between the parties with respect to the payment or compensation for plantations or sprouts which Aramburu would have planted and not cut, independently of his good or bad faith, and, at the same time, to regulate the rights and obligations of the Asociación and of Aramburu, as incoming sublessor and outgoing sublessee respectively, during the last annuity disregarding thus the provisions of § 1468 of the Civil Code (31 L.P.R.A. § 4084) which provides:

"The outgoing lessee must permit the incoming one the use of the place and of all other necessary means for the preparatory labor for the following year, and, mutually, the latter is obliged to permit the outgoing one all that may be necessary for the gathering and enjoyment of the fruits, all in accordance with the customs of the place."

We did not find anything in the fifth clause which is contrary to law, morale, or public order. *Juncos Central* v. *Del Toro*, 41 P.R.R. 182 (1930); *Bravo* v. *Hau*, 59 P.R.R. 692 (1942). Neither do reasons exist here to justify the applicability of the doctrine of unjust enrichment. *Compañía Popular* v. *District Court*, 63 P.R.R. 116 (1944); *Silva* v. *Industrial Commission*, 91 P.R.R. 865 (1965); *San Miguel Fertil. Corp.* v. *P.R. Drydock*, 94 P.R.R. 403 (1967). The enrichment, if the Asociación had any in its relations with Aramburu, did not lack cause considering that it was Aramburu's obligation to deliver the cane to the Asociación at the rhythm of the

grinding in order that the beginning of the cutting would coincide with the beginning of the grinding season and the ending of the cutting with the ending of the grinding season and that all the cane would be totally and exclusively ground at Central Lafayette. We do not find any reason whatsoever to give rise in this case to a reduction in the rent or in the payment of the property taxes.

For the foregoing reasons the judgment object of the instant appeal will be affirmed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Pérez Pimentel did not participate herein.